# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>vs.<br><br>SAHEED YUSUF,<br><br>      Defendant. | **MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTIONS TO SUPPRESS**<br><br>2:18-cr-00281-RJS-DBP<br><br>Chief District Judge Robert J. Shelby<br>Chief Magistrate Judge Dustin B. Pead |

Defendant Saheed Yusuf is charged with bank and wire fraud, money laundering, and identity theft.[1]  Pursuant to an arrest warrant issued in Utah, Yusuf was taken into custody on July 6, 2018, at his residence in Lithonia, Georgia.  He now moves to suppress evidence in the form of cell phones, a laptop computer, and documents seized during the execution of that arrest warrant.[2]  And in a second Motion, he moves to suppress evidence eventually discovered on the devices that were seized during the execution of a later-obtained search warrant.[3]  Yusuf argues both the seizure of the evidence and subsequent search of the devices violated his Fourth Amendment rights.  For the reasons explained below, the court disagrees, and DENIES Yusuf's Motions.[4]

---

[1] Dkt. 89, *Superseding Indictment*.

[2] Dkt. 97, *First Motion to Suppress* (First Motion); Dkt. 126, *Memorandum in Support of First Motion* (Memo. Supp. First Mot.).  Yusuf filed his Memorandum in Support of his First Motion to Suppress separately from the Motion itself.  For clarity, the court will refer only to Yusuf's First Motion when discussing his supporting arguments, even though specific arguments are set forth in his Memorandum in Support, which is a separate docket entry.  Yusuf's Memorandum in Support of his Second Motion was attached to the Motion itself.

[3] Dkt. 116 (Second Motion).

[4] Dkts. 97 and 116.

## BACKGROUND AND PROCEDURAL HISTORY

### A. Information Obtained Prior to the Execution of the Arrest Warrant

In June 2016, Scott Pugmire—then both an agent with the Utah Bureau of Investigation and an FBI Cyber Task Force Officer (TFO)—began investigating a crime involving a Utah company defrauded through email impersonation.[5]  TFO Pugmire had been assigned full-time to the FBI's Cyber Task Force since November 2015.[6]

Throughout the investigation, TFO Pugmire worked with and provided information to other investigators to secure search warrants in the Northern District of Georgia and the District of Utah.[7]  Those investigators included Special Agent Kevin Hall from the Northern District of Georgia and Special Agent Stephen Olsen from the District of Utah.[8]

As early as April 2017, TFO Pugmire had obtained significant evidence relating to what appeared to be a conspiracy to defraud businesses through impersonation emails.  The evidence included complaints and reports by victims and banks, and public records maintained by Georgia's Secretary of State.[9]  Based on his investigation, TFO Pugmire identified several names of persons and entities with suspected involvement in the scheme.[10]  Among the suspected names

---

[5] Dkt. 123-4, *June 1, 2021 Declaration of TFO Scott Pugmire* (Pugmire Decl.) ¶ 2.

[6] *Id.* ¶ 1.

[7] *Id.* ¶ 2.

[8] *Id.*

[9] *Id.* ¶ 3.

[10] *Id.*

and entities were Vanisha Mathis, Ashley Smith, and Allied Logistics Group.[11]  The investigation further revealed several entities had been victims of the scheme.[12]

Over the next six months, TFO Pugmire and other investigators reviewed financial records and transaction surveillance for bank accounts in the names of the suspected persons and entities involved in the scheme.[13]  They also reviewed records from internet providers, cellular service providers, and Georgia's Secretary of State.[14]

On February 2, 2018, TFO Pugmire requested the FBI's Atlanta Field Office interview Vanisha Mathis.[15]  Special Agent Kawanski Wright,[16] who would later be involved in Yusuf's arrest and the seizure of the devices at issue here, conducted the interview on April 27, 2018.[17] During the interview, Mathis explained that she and Yusuf met in 2014, had developed a relationship, and Yusuf had a key to Mathis's apartment.[18]  On at least one occasion, Mathis came home from work to find Yusuf with multiple cell phones, laptops, stacks of bank cards, and paperwork in the names of other people.[19]  Mathis informed Special Agent Wright that throughout their relationship, Yusuf told Mathis he had a way for her to make money.[20]  Mathis explained that in the summer of 2016, Yusuf provided her with a debit card and an English

---

[11] *Id.* ¶ 4.  Other names included Kelvin Abraham, Amos Adebeyo, Daniel Bimbo, Macaulay Johnson, and entities associated with those names, including KLV Logistics Group Inc., Winder GA Group Inc., Highlands Professional, Solution PA Corp. Inc., and Absolute Ga Equip Inc.  *Id.*

[12] *Id.* ¶ 3.

[13] *Id.* ¶¶ 5, 9.

[14] *Id.*

[15] *Id.* ¶¶ 4, 6.

[16] Dkt. 129-2, *Summary of Vanisha Mathis Interview by Special Agent Wright* (Mathis Interview) at 1.

[17] Dkt. 123-4 (Pugmire Decl.) ¶ 6.

[18] Dkt. 129-2 (Mathis Interview) at 1.

[19] *Id.*

[20] *Id.* at 2.

passport with her photo, both in the name of Ashley Smith.[21]  Following Yusuf's instructions, Mathis used the passport to open accounts for a business called "Allied Logistics Group" at Bank of America and purchase cashier's checks.[22]  Later, Yusuf continued to call Mathis and send text messages to elicit her help in other fraud schemes.[23]  Yusuf also used Facebook Messenger to communicate with Mathis, including sending a threatening message in March or April 2018 warning her not to talk to authorities.[24]

By May 2018, investigators identified Yusuf as a target of the investigation.[25]  On June 6, 2018, a federal grand jury in the District of Utah returned an Indictment against Mathis and Yusuf.[26]  The United States alleged in the Indictment that Yusuf and Mathis conspired with each other and "others known and unknown," and attempted fraud against "dozens of businesses in the United States and the United Kingdom."[27]  The United States charged Yusuf in the Indictment with one count of conspiracy to commit bank fraud in violation of 18 U.S.C. § 1344, two counts of wire fraud in violation of 18 U.S.C. § 1343, one count of aggravated identity theft in violation of 18 U.S.C. § 1028A, and one count of money laundering conspiracy in violation of 18 U.S.C. § 1956(h).[28]  The Indictment described a scheme involving email fraud and the use of

---

[21] *Id.*

[22] *Id.*

[23] *Id.* at 3.

[24] *Id.*  In a later interview with Mathis, she indicated many if not most of her communications with Yusuf were through Facebook Messenger.  Dkt. 123-3 (Olsen Affidavit) ¶ 41.  In this later interview, however, she stated the threatening conversation took place over a phone call.  *Id.*

[25] Dkt. 123-4 (Pugmire Decl.) ¶ 7.

[26] *Id.* ¶ 8.  The United States later dropped all charges against Mathis.  Dkts. 61, 65.

[27] Dkt. 1 (Indictment) ¶¶ 2–3.

[28] *Id.* at 7–10.  A Superseding Indictment as to Yusuf was returned on October 22, 2020, dropping Mathis as a Defendant, adjusting the charges based on information learned during the ongoing investigation, and adding an additional count of aggravated identify theft.  *See* Dkt. 89 (Superseding Indictment).

entities and aliases to perpetrate the money laundering conspiracy.[29]  According to the

Indictment, Yusuf used emails impersonating other people to direct employees of victim

companies to wire money to accounts under the control of Yusuf and co-conspirators.[30]

On the same day the Indictment was returned, this court issued an arrest warrant for

Yusuf, which TFO Pugmire transmitted to the FBI's Atlanta Field Office.[31]

### B.  Execution of the Arrest Warrant at Yusuf's Residence

Special Agents Wright and Hall, along with others, executed the arrest warrant at Yusuf's

Lithonia, Georgia residence on July 6, 2018.[32]  Agents arrived early in the morning, around 6:00

a.m., and observed a previously-identified vehicle registered in Yusuf's name.[33]  After agents

knocked and announced themselves, several people came out of the home.[34]  At least one person

exiting the home confirmed Yusuf was inside.[35]  Agents repeatedly called for Yusuf to exit, but

ultimately received no response.  Agents then entered the home to find him.[36]

Agents proceeded through the entryway and into the kitchen.[37]  There, they observed in

plain sight two laptop computers sitting on a table.[38]  They also noticed a doorway leading into

another room.[39]  The agents entered the doorway and observed a person under the covers on a

---

[29] Dkt. 1 (Indictment) at 1–6; Dkt. 89 (Superseding Indictment) at 1–7.

[30] Dkt. 1 (Indictment) at 1–6; Dkt. 89 (Superseding Indictment) at 1–7.

[31] Dkt. 123-4 (Pugmire Decl.) ¶ 8.

[32] *Id.* ¶ 9; Dkt. 126 (Memo. Supp. First Mot.) at 2.

[33] Dkt. 129-12 (Hall Affidavit) ¶ 17.

[34] *Id.*

[35] *Id.*

[36] Dkt. 137, *Transcript of Special Agent Wright's Testimony at Evidentiary Hearing on June 24, 2021* (Wright Testimony) at 25–26.

[37] *Id.* at 29.

[38] *Id.*

[39] *Id.* at 26, 29.

bed.[40]  With weapons drawn, they removed the covers and saw Yusuf on the bed with three

mobile devices next to him, one of which was attached to headphones in his ears.[41]  Yusuf was

placed in handcuffs while still in the bedroom.[42]

Special Agent Wright escorted Yusuf through the kitchen and toward the entry of the

house.[43]  While in the kitchen, Yusuf indicated a shirt nearby belonged to him.[44]  Special Agent

Wright helped get the shirt and put it on Yusuf.[45]  Near the shirt, agents saw a paper on a table

with Social Security numbers, dates of birth, and names of persons who were not members of

Yusuf's household.[46]  The paper was sitting next to one of the laptops on the table.[47]  While still

in the kitchen, Yusuf volunteered that one of the laptops on the table was not his.[48]  Special

Agent Wright then removed Yusuf from the home while other agents remained to seize the other

laptop and the three mobile devices.[49]  Around 6:31 a.m., agents photographed the items in the

places they were found.[50]  Agents then seized the devices, completed an inventory sheet

describing in detail what had been taken, placed the sheet on the table, and left the home around

---

[40] *Id.* at 26–27.

[41] *Id.* at 27; Dkt. 129-9 (Photo of Bed); Dkt. 129-12 (Hall Affidavit) ¶ 19.

[42] Dkt. 137 (Wright Testimony) at 29.

[43] *Id.* at 30.

[44] *Id.*; Dkt. 129-12 (Hall Affidavit) ¶ 22.

[45] Dkt. 129-12 (Hall Affidavit) ¶ 22.

[46] *Id.*

[47] Dkts. 129-7, 129-8 (Photos of Table).

[48] Dkt. 129-12 (Hall Affidavit) ¶ 12.

[49] Dkt. 137 (Wright Testimony) at 51, 53.

[50] *Id.*; Dkts. 129-6–129-10 (photos with timestamp).

6:45 a.m.[51]  The agents did not seize the laptop Yusuf indicated was not his, nor did they seize a fourth cell phone that was not found with the other three in the bed where Yusuf was found.[52]

### C.  The Search Warrant and Search of the Devices

Special Agent Hall prepared a search warrant application based upon information gathered during the investigation and arrest,[53] and a search warrant for the seized devices was issued from the Northern District of Georgia on July 12, 2018 (Georgia Warrant).[54]  The devices were then sent to a laboratory in Utah to perform the search.[55]  An initial search of Yusuf's phone revealed an image with information about transactions involving "KLV Logistics Group," "Allied Tech Group," and other entities.[56]

On or around August 23, 2018, Special Agent Hall informed TFO Pugmire that the Atlanta FBI office had just opened a new investigation he believed was related to Yusuf.[57]  In the new investigation, a victim airline made a criminal complaint about a fraudulent diversion of funds in June 2018 which was similar to the diversion of funds from the Utah company that prompted the original 2016 investigation.[58]  The new investigation yielded evidence that funds were diverted to an account for "Richcam Décor Consultant Inc.," and from there to "Allied

---

[51] Dkt. 129-10 (Photo of Inventory Sheet on Table); Dkt. 129-11 (Inventory Sheet).

[52] *See* Dkt. 129-12 (Hall Affidavit) at 27; Dkt. 129-9 (Photo of Bedroom).

[53] Dkt. 123-4 (Pugmire Decl.) ¶ 9.  TFO Pugmire's Declaration states, "Special Agent Hall, who was also present at the arrest, prepared a search warrant application based largely upon information that was provided by Assistant United States Attorney (AUSA) Carl LeSueur."  *Id.*  In its Opposition, the United States clarifies that, while it provided information for the search warrant application to Special Agent Hall, that information was gathered by TFO Pugmire, and TFO Pugmire later verified that information with Special Agent Hall.  *See* Dkt. 123 (Opp. Second Mot.) at 12.

[54] Dkt. 123-2 (Georgia Warrant).

[55] Dkt. 123-4 (Pugmire Decl.) ¶ 10.

[56] *Id.* ¶¶ 10, 16.

[57] *Id.* ¶ 11.

[58] *Id.*

Tech Group," "KLV Logistics Group," and "Builders Customers Inc."[59]  A review of public information databases found that the Social Security number used to register the Richcam Décor Consultant Inc. account was associated with Yusuf's address in Lithonia, Georgia.  Special Agent Hall also found several persons and entities associated with the same phone number used to open the Richcam Décor Consultant Inc. account, including "Rose Williams," "Kelvin Abraham," "Bimbo Daniel," "Amos Adebayo," "KLV Logistics Group," "Clear Class Classics," "Absolute GA Equip," and "Rainbow Equipment."[60]  Investigators in the Utah FBI office discovered the description of the flow of funds identified by the Atlanta office corresponded to the amounts and direction of funds depicted in the image recovered from Yusuf's phone.[61]  They also recognized some of the names provided by the Atlanta office.[62]

On or before September 13, 2018, a fitness center company made a criminal complaint concerning funds diverted to "Richcam Décor Consultant, Inc.," the same company used to divert funds from the airline.[63]  Based on this information, the Utah investigators believed the transaction fraud involving the airline and fitness center were part of the same scheme involving Yusuf.[64]

In a September 14, 2018 interview with TFO Pugmire, Mathis made statements that varied slightly from her earlier interview.[65]  As a result, TFO Pugmire instructed the analysts

---

[59] Dkt. 123-5 (Hall Email Correspondence).

[60] *Id.*

[61] Dkt. 123-4 (Pugmire Decl.) ¶¶ 4, 11–12.

[62] *Id.*

[63] *Id.* ¶ 13.

[64] *Id.*

[65] *Id.* ¶14.

searching Yusuf's devices to pause so the newly-clarified facts could be presented to a judge to consider the issuance of a second warrant.[66]

Over the next week, TFO Pugmire was contacted by both the New York Police Department and the Chicago FBI office to inform him they were each conducting investigations into fraudulently-diverted funds.[67]  The Chicago FBI office believed its investigation was related because funds intended for a Chicago business were diverted from its customers, including the same fitness company defrauded previously, to an account for "Allied Tech Group," which was involved in the airline fund diversion being investigated in Atlanta.[68]

TFO Pugmire and Special Agent Olsen prepared a new search warrant application clarifying the variances in facts from Mathis' second interview.[69]  A magistrate judge in the District of Utah issued a warrant based on the new application on September 27, 2018.[70]  After reviewing the new warrant, TFO Pugmire provided it to the analysts assisting in the search of the devices so they could resume their search.[71]

Trial was initially set in this case for October 16, 2018.  That date has been moved several times for a variety of reasons, including the volume of discovery and the complexity of the case, Yusuf's retention of new counsel on multiple occasions, and the COVID pandemic's

---

[66] *Id.*

[67] *Id.* ¶¶ 15, 16.

[68] *Id.*

[69] *Id.* ¶ 17; Dkt. 123-3 (Utah Warrant) ¶¶ 38–44.

[70] Dkt. 123-3 (Utah Warrant).  Yusuf's Second Motion challenges only the Georgia Warrant.  *See* Dkt. 116 (Second Motion) at 1.  The Utah Warrant is nearly identical, with some varied language and elaboration of records to be searched.  *See* Dkt. 123-3, *Attachment B of Utah Warrant* at 36; Dkt. 116-1, *Attachment B of Georgia Warrant* at 20. Special Agent Olsen's supporting affidavit for the Utah Warrant states the purpose of the new warrant is to provide clarification based on factual discrepancies from Mathis' interview before continuing the search of Yusuf's devices. Dkt. 123-3 (Olsen Affidavit) ¶¶ 8, 39–44.  It also contains more factual detail than the earlier affidavit from Special Agent Hall supporting the Georgia Warrant.  *See* Dkt. 129-12 (Hall Affidavit) at 23–41.

[71] Dkt. 123-4 (Pugmire Decl.) ¶ 17.

impact on in-person trials.  Pursuant to an Order entered on June 29, 2021, trial is currently set to begin on November 15, 2021.[72]

### D.  *Yusuf's Motions to Suppress and Evidentiary Hearing*

On January 22, 2021, Yusuf filed his first Motion to Suppress, arguing the United States violated his Fourth Amendment rights by seizing his cell phones, laptop, and documents without a warrant.[73]  On May 4, 2021, Yusuf filed his second Motion to Suppress,[74] arguing the subsequent search of his devices also violated his Fourth Amendment rights because the Georgia Warrant was not sufficiently particular.[75]  On June 24, 2021, the court held an evidentiary hearing in which Special Agent Wright testified about the events surrounding Yusuf's arrest.[76]

Special Agent Wright also testified about his knowledge and experience investigating cyber crimes for the FBI, as well as his understanding of the crimes under investigation in this case.  At the time Special Agent Wright interviewed Mathis, he had been assigned to investigate cyber crimes for three years, working solely on business email compromise schemes involving emails spoofed to appear as though they came from executives within the victim company.[77]  He testified that in his experience, participants in those crimes communicate with each other through mobile devices, most frequently using social media messaging services such as WhatsApp and

---

[72] Dkt. 125.

[73] Dkt. 97 (First Motion).

[74] Yusuf filed his second Motion to Suppress on May 4 and filed an Amended Motion to Suppress two days later. Dkts. 114, 116.

[75] Dkt. 116 (Second Motion).

[76] Dkt. 135.

[77] Dkt. 137 (Wright Testimony) at 12–15.

Facebook Messenger.[78]  Special Agent Wright also testified he understood the specific crimes under investigation relating to Yusuf involved a business email compromise scheme.[79]

Special Agent Hall, who was present at Yusuf's arrest, stated the items Mathis described seeing with Yusuf were the kinds of items that would be used in a fraud scheme.[80]

## LEGAL STANDARD

The Fourth Amendment protects the public from "unreasonable searches and seizures."[81] Authorities must first obtain a warrant based on probable cause to conduct a lawful search or seizure,[82] unless one of the many exceptions to the warrant requirement applies.[83]  Evidence seized in violation of the Fourth Amendment is precluded from admission under the exclusionary rule,[84] which excludes "both the primary evidence obtained as a direct result of an illegal search or seizure," as well as "evidence later discovered and found to be derivative of an illegality, the so-called fruit of the poisonous tree."[85] In determining whether a violation has occurred, the "ultimate touchstone of the Fourth Amendment is reasonableness."[86]

"[T]he defendant bears the burden of proving whether and when the Fourth Amendment was implicated,"[87] and "[t]he government then bears the burden of proving that its warrantless

---

[78] *Id.* at 16.

[79] *Id.* at 14–15.

[80] Dkt. 123-3 (Olsen Affidavit) ¶ 43.

[81] *United States v. Jones*, 701 F.3d 1300, 1312 (10th Cir. 2012) (quoting U.S. Const. amend IV).

[82] *See Terry v. Ohio*, 392 U.S. 1, 20 (1968) (citations omitted).

[83] *See Coolidge v. New Hampshire*, 403 U.S. 443, 454–55 (1971).

[84] *Mapp v Ohio*, 367 U.S. 643, 648 (1961).

[85] *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016) (citation omitted).

[86] *United States v. Metts*, 748 F. App'x 785, 788 (10th Cir. 2018) (unpublished) (quoting *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006)).

[87] *United States v. Neugin*, 958 F.3d 924, 930 (10th Cir. 2020) (quoting *Hernandez*, 847 F.3d 1257, 1263 (10th Cir. 2017)).

actions were justified [by an exception]."[88]  If the government establishes that an exception to the warrant requirement applies, the action is constitutional.[89]

## ANALYSIS

Yusuf's First Motion challenges the warrantless seizure of his electronic devices as unconstitutional.  Yusuf concedes, however, there are two exceptions to the warrant requirement that are potentially applicable to this case: (1) search incident to arrest, and (2) the plain view doctrine.  According to Yusuf, the seizure of his devices fails to qualify under either exception.  The United States disagrees, arguing the seizures of the cellphones, laptop, and document were authorized under the plain view seizure exception.  In opposition to Yusuf's arguments, the United States contends he conflates the legal concepts of searches, seizures, plain view observations and plain view seizures.  It further contends Yusuf conflates the search authority of an arrest warrant and a search incident to arrest.

In his Second Motion, Yusuf argues the subsequent search of his devices was unconstitutional because the search warrant lacked sufficient particularity to limit the scope of the search.  The United States contends the warrant included sufficient limiting features given the complex and ongoing nature of the crime, and even if the warrant is found to be invalid, the officer acted reasonably in good faith.

As a preliminary matter, Yusuf conceded at oral argument the officers were justified in entering the residence pursuant to the arrest warrant because they first called for him to come out and he did not respond.  Nor does Yusuf appear to contest the search to locate him within the home under the authority of the arrest warrant.  This includes removing the bed covers to reveal

---

[88] *Id.* (quoting *United States v. Carhee*, 27 F.3d 1493, 1496 (10th Cir. 1994)).

[89] *Id.* (citing *United States v. Maestas*, 2 F.3d 1485, 1491-92 (10th Cir. 1993)).

Yusuf and the three cell phones.  For this reason, the court will not discuss the legality of the officers' initial entry into the house or the legality of the action of uncovering the bed covers, revealing not only Yusuf, but also the cell phones in plain view.

The court will now address Yusuf's Motions in turn.

**I.      The Seizure of Yusuf's Items was Constitutional Under the Plain View Doctrine**

For reasons explained below, the court finds the seizures at issue implicate the plain view seizure doctrine rather than a search incident to arrest.  However, the court will analyze the seizure under both doctrines because Yusuf argues both are potentially applicable.  The court will begin with a discussion of the relevant legal standards governing plain view seizures and searches incident to arrest.

*A.  Legal Standards*

Under the plain view doctrine, evidence may be seized without a warrant if: "(1) the officer was lawfully in a position from which the object seized was in plain view, (2) the object's incriminating character was immediately apparent (i.e., there was probable cause to believe it was . . . evidence of a crime), and (3) the officer had a lawful right of access to the object."[90] The plain view exception operates only to "supplement the prior justification" for the initial lawful intrusion—"whether it be a warrant for another object, hot pursuit, search incident to arrest, or some other legitimate reason for being present unconnected with a search directed against the accused."[91]

---

[90] *United States v. Thomas*, 372 F.3d 1173, 1178 (10th Cir. 2004); *Horton v. California*, 496 U.S. 128 (1990).

[91] *United States v. Davis*, 94 F.3d 1465, 1470 (10th Cir. 1996).

Different from plain view seizures, the 'search incident to arrest' exception allows an officer effecting an arrest to search, without a warrant, the arrestee's person and areas within the person's immediate control to remove weapons or destructible evidence.[92]  This exception to the warrant requirement has traditionally been justified by the concern for officer safety and potential destruction or concealment of evidence.[93]  However, "the justification for allowing a search incident to arrest also places a temporal restriction upon the [officer]'s conduct."[94] "[O]nce the immediate rationale for conducting a search incident to arrest has passed," officers cannot avail themselves of the exception.[95]

### B.  The Seizures Were Not Justified Under the Search Incident to Arrest Exception

Yusuf argues the officers exceeded the scope of a search incident to arrest by seizing the electronic devices and documents after Yusuf was handcuffed and removed from the home.  In support of this argument, Yusuf points to facts suggesting that, even while still in the home, he was restrained and could not reach or grab weapons or evidence.[96]  With respect to the three cell phones uncovered on the bed, Yusuf argues that once officers removed the bed covers, he was immediately placed on the ground and handcuffed, beyond the reach of the devices.[97]  With

---

[92] *Chimel v. California*, 395 U.S. 752, 763 (1969); *United States v. Edwards*, 415 U.S. 800, 802 (1974).

[93] *Id.*; *United States v. Edwards*, 415 U.S. 800, 802–03 (1974) (explaining the search incident to arrest exception "has traditionally been justified by the reasonableness of searching for weapons, instruments of escape, and evidence of a crime when a person is taken into official custody and lawfully detained").

[94] *Edwards*, 415 U.S. at 643.

[95] *Id.*

[96] Dkt. 126 (Memo. Supp. First Mot.) at 8–9.

[97] *Id.* at 8.  While the United States does not argue the seizure of the cell phones was authorized pursuant to a search incident to arrest, it does argue the action of uncovering the phones was authorized as a search incident to arrest. Specifically, the United States argues that, "to the extent the initial discovery of the cell phones required any search, that search was complete when agents removed the bedcovers to find [Yusuf].  At that point, the cell phones were revealed in [Yusuf]'s reach and he was not yet handcuffed or secured."  Dkt. 129 (Opp. First Mot.) at 16 n.8.  Thus, according to the United States, "[t]he intrusion that led to the initial discovery of the cell phones and their exposure

14

respect to the laptop and document on the kitchen table, Yusuf argues he remained handcuffed while being escorted back through the kitchen toward the exit and was still unable to grab anything to enable an escape or destroy evidence.[98]  Finally, Yusuf argues all the evidence was photographed and seized while he was secured outside the home.[99]  Based on these facts, Yusuf concludes the actions of photographing and seizing the evidence "exceeded the scope of the justifications for a search incident to arrest exception to the warrant requirement" and there was no exigency justifying law enforcement's continued presence in the home to carry out these actions without first obtaining a search warrant.[100]

The court agrees with Yusuf that none of the items could have been lawfully seized under the authority of a search incident to arrest.  As Yusuf points out, at the time the seizures occurred, the exigencies which justify searches incident to arrest—officer safety and the destruction or concealment of evidence—had already ceased.[101]  Yusuf was handcuffed in the bedroom and could not reach the cell phones.  He remained handcuffed while being escorted through the kitchen and could not reach the laptop, document, or any weapon to resist arrest. And "if there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search [or seize], both justifications for the search-incident-to-arrest exception are absent and the rule does not apply."[102]

---

to plain view, was [] both authorized in the inherent authority of the arrest warrant and as a search incident to arrest. *Id.*  As mentioned previously, Yusuf does not appear to contest this.

[98] Dkt. 126 (Memo. Supp. First Mot.) at 9.

[99] *Id.*

[100] *Id.*

[101] *Id.* at 8 ("Since the defendant was physically restrained, as in *Gant*, any exigency that would justify a search incident to arrest no longer existed.").

[102] *Arizona v. Gant*, 556 U.S. 332, 339 (2009).

However, the court parts ways with Yusuf concerning the underlying relevance of the search incident to arrest exception here.   Instead, the court agrees with the United States that the plain view exception, and not search incident to arrest, seems most relevant to the seizures at issue.

C.   *Applying the Plain View Doctrine, the Seizure of Yusuf's Items was Reasonable*

Yusuf argues the plain view seizure exception to the warrant requirement does not authorize the seizure of his items.   Specifically, Yusuf appears to argue the first and third *Horton* elements of the plain view exception are not met because the agents exceeded the scope of a search incident to arrest.[103]   Yusuf argues the second *Horton* element is not met because the incriminating nature of the items was not immediately apparent.

First, the court will address Yusuf's arguments on the first and third *Horton* elements together, as he believes both implicate search-incident-to-arrest principles in this case.   The court will then apply the *Horton* elements, in order, to the seizures at issue.

1.   Yusuf's Arguments Concerning the First and Third *Horton* Elements Misconstrue Current Legal Doctrine

Yusuf argues the first *Horton* element, lawful presence, is not satisfied because "agents exceeded the scope of a search incident to arrest."[104]   According to Yusuf, officers were no longer lawfully present in the home at the time the items were seized because he had already

---

[103] Dkt. 126 (Memo. Supp. First Mot.) at 12–13 ("[I]t is clear that the plain view exception does not justify the seizure of the materials from the defendant's residence.   First, as previously described, the agents exceeded the scope of a search incident to arrest.").

The Supreme Court's opinion in *Horton v. California*, 496 U.S. 128 (1990) defined the plain view seizure doctrine as we know it today.   *Horton* laid out three elements that must be satisfied to justify a warrantless seizure of evidence in plain view: (1) the officer must be lawfully present at the place from which the evidence can be plainly viewed, (2) the incriminating character of the evidence must be "immediately apparent," and (3) the officer must have a lawful right of access to the object itself.   *Horton*, 496 U.S. at 136–137.   These elements are known as the *Horton* factors.

[104] *Id.* at 12.

16

been removed from the residence, was unable to access weapons to resist escape, and was unable to access destructible evidence.[105]  As to the third element, lawful access to the items, Yusuf argues he had already been removed from the house and secured in a vehicle at the time of the seizure, and that agents no longer had "legal authority to remain or re-enter the residence" because "[t]hey did not have a search warrant, . . . consent . . . , [or] other exigent circumstance to justify their continued presence in the home."[106]  Based on his briefs alone, the court struggles to find a meaningful distinction between Yusuf's arguments under the first and third *Horton* elements.

At oral argument, however, Yusuf presented a more nuanced version of his position.  On the first element of lawful presence, Yusuf argued that once officers carried out the justification for their entry—to arrest him and remove him from the home, as authorized by the arrest warrant—they were no longer lawfully present for purposes of the plain view exception and seizing evidence would exceed the scope of the arrest warrant.  Yusuf further contended that, once he was removed,[107] officers needed to obtain a search warrant to re-enter or remain in the home to seize potentially incriminating[108] evidence, even though it was already observed in plain view while officers were lawfully executing an arrest warrant.  Under the third *Horton* element, Yusuf argued officers only had lawful access to seize incriminating evidence in plain view on his

---

[105] *Id.* ("The defendant had been secured and was in a position where he was unable to gain access to a weapon to resist arrest or escape . . . . [or] access destructible evidence.  This was compounded by the fact that the defendant had been removed from the residence at the time the items were seized.").

[106] *Id.* at 13.

[107] Yusuf conceded, however, that while he was still in the kitchen with officers, they were lawfully present under the first *Horton* element.  But, as described below, Yusuf contends they were still limited to seizing items within his immediate reach area under the third *Horton* element.

[108] Yusuf disputes the incriminating nature of the items seized, as discussed *infra*.

person or within his immediate reach because this is was a search incident to arrest, or at least the entry into the home was incident to an arrest.[109]

Yusuf appears to base his interpretation of the plain view seizure doctrine on the Supreme Court's opinions in *Chimel v. California* and *Arizona v. Gant*.[110]  In *Chimel*, the Supreme Court held that officers conducting an arrest can search the person and areas within the person's reach to remove weapons or seize evidence that might be destroyed or concealed.[111]  In *Gant*, the Supreme Court held that "the *Chimel* rationale authorized police to search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search."[112]  Thus, it was unreasonable for an officer to secure the arrestee in the patrol car and then proceed to search the vehicle as a search incident to arrest because the justifications for the exception were no longer present.[113]

Both *Chimel* and *Gant* deal with the search-incident-to-arrest exception.  As the court understands it, Yusuf's position expands these holdings into the plain-view-seizure context, suggesting the limitations of *Chimel* and *Gant* apply there as well.[114]  For example, on the issue of lawful presence, Yusuf argues once he was removed from the home and secured, "as with respect to the automobile in *Gant*, the officers needed a warrant to remain in the residence and to

---

[109] Yusuf distinguishes between entering the home to conduct an arrest and entering under an exigent circumstance. According to Yusuf, if officers entered the home under an exigent circumstance, such as hot pursuit, they would not be limited to the area surrounding Yusuf and could seize items in plain view so long as it was reasonable.

[110] *Chimel*, 395 U.S. at 752; *Gant*, 556 U.S. at 332.

[111] *Chimel*, 395 U.S. at 763; *Gant*, 556 U.S. at 339 (citing *id*).

[112] *Gant*, 556 U.S. at 343.

[113] *Id.* at 339 ("If there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception are absent and the rule does not apply.").

[114] Yusuf conceded at oral argument, however, that he is not aware of a specific case that stands for the position he advances.

seize the document and electronic devices."[115]  And on the issue of lawful access, Yusuf

maintained at oral argument that because *Chimel* limited searchable areas to the those within

reach of the arrestee, officers could only seize items in plain view within his immediate

vicinity.[116]

The United States argues Yusuf's reliance on search-incident-to-arrest principles here is

misplaced for multiple reasons.  In general, the United States argues Yusuf "conflates the legal

concepts of searches, seizures, and plain view observations, and plain view seizures."[117]  First,

the United States argues Yusuf misstates the holding of *Gant* because he conflates searches and

seizures.[118]  Specifically, the United States argues *Gant* held "the post-removal *search* of a

vehicle could not be a lawful search incident to arrest," but it "provides no guidance on the mere

*seizure* of a previously discovered item."[119]  The court agrees with the United States.  The

distinction between searches and seizures is an important one when considering the plain view

doctrine.[120]  *Gant* limits warrantless searches incident to arrest, but "[i]f an article is already in

plain view, neither its observation nor its seizure would involve any invasion of privacy,"[121] and

"there would be . . . no 'search' within the meaning of the Fourth Amendment."[122]

---

[115] Dkt. 126 (Memo. Supp. First Mot.) at 9.

[116] *See also id.* at 8 (citing to *Chimel*, 395 U.S. at 762–63).  Yusuf's precise arguments on these issues, as articulated at oral argument, were not readily apparent from his briefs.  But in re-visiting Yusuf's briefs after oral argument, the court can identify traces of his more detailed position.

[117] Dkts. 129 (Opp. First Mot.) at 16–19.

[118] *Id.* at 16 (citing to *Horton*, 496 U.S. at 134).

[119] *Id.* at 16–17.

[120] *Horton*, 496 U.S. at 133.

[121] *Id.*

[122] *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993).

This leads to the United States' second argument against Yusuf's theory: "neither observing nor seizing an item in plain view is a search," thus, "[o]nce the cell phones, laptops, and document were lawfully exposed to agents' plain view, it did not matter whether Defendant was placed in handcuffs or not."[123]  Again, the court agrees with the United States.  This argument relates primarily to Yusuf's position on the lawful access element of *Horton.  Chimel*, like *Gant*, defines situations in which offers may conduct a limited search for limited purposes— in other words, it defines when officers conducting an arrest are authorized to "compromise the individual interest in privacy"[124] for the purposes of officer safety or preservation of evidence.[125] Neither observing nor seizing an item in plain view involves any invasion of privacy,[126] nor does it necessarily implicate the arrest-related concerns of officer safety and preservation of evidence that served as the basis for the *Chimel* decision.  Therefore, the court does not view *Chimel*'s limitations on the scope of a search incident to arrest to impose any restriction on plain view seizures.

Third, the United States argues Yusuf conflates the search authority of an arrest warrant with a search incident to arrest,[127] which bears on the lawfulness of the agents' presence after Yusuf was restrained.  The United States argues that an arrest warrant inherently authorizes "entry into a *place*" and is confined to searching only places a person could be found, but a search incident to arrest authorizes the "search of a *person*" and is confined to the area within

---

[123] Dkt. 129 (Opp. First. Mot.) at 17.

[124] *See Horton*, 496 U.S. at 133. (explaining that a search "compromises the individual interest in privacy" and a seizure "deprives the individual of dominion over her person or property").

[125] *Gant*, 556 U.S. at 338 (citing *Chimel*, 395 U.S. at 763).

[126] *Horton*, 496 U.S. at 133.

[127] Dkt. 129 (Opp. First Mot.) at 16, 17–18.

their reach.[128]  Because the agents' authority to enter Defendant's home arose out of an arrest warrant, the United States argues their continued presence in the home once he was handcuffed was "governed by arrest warrant authority, not authority for searches incident to arrest."[129]  The court finds this reasoning persuasive and generally consistent with legal authority.  "[T]he first and most fundamental prerequisite to reliance upon plain view as a basis for a warrantless seizure [] is that the initial intrusion which brings the police within plain view of such an article is itself lawful."[130]  The plain view doctrine then "serves to supplement the prior justification" for the initial intrusion.[131]  Here, the initial intrusion into Yusuf's residence was lawfully authorized by an arrest warrant, therefore the agents could rely on the supplemental authority of the plain view doctrine to seize incriminating items in plain view without a warrant.[132]

Finally, the United States argues that officers can remain in a residence, or re-enter after a brief exit, to seize items observed in plain view, so long as they do so within a reasonable time.[133]  It cites to opinions from multiple circuit courts, including the Tenth Circuit, to support this proposition.[134]  The court is not aware of any case imposing a temporal limitation preventing officers from remaining or re-entering a home, after an arrestee is detained, to seize evidence

---

[128] *Id.* at 17.

[129] *Id.*

[130] *Davis*, 94 F.3d at 1470 (citations omitted).

[131] *Id.*

[132] *See id.*  At oral argument, Yusuf suggested the plain view doctrine was inapplicable because the seizure of the evidence was unrelated to the justification of the arrest warrant that granted them entrance.  The Supreme Court explains that when the plain view doctrine is invoked, there will "always exist[]" a lack of relationship between the justification of the initial intrusion and the action validated under the plain view doctrine.  Indeed, "where action is taken for the purpose justifying the entry, invocation of the [plain view] doctrine is superfluous." *Arizona v. Hicks*, 480 U.S. 321, 325 (1987).

[133] Dkt. 129 (Opp. First Mot.) at 18–19.

[134] *Id.* (citing *Harris v. Ford*, 369 F. App'x 881 (10th Cir. 2010) (unpublished); *United States v. Garibay*, 334 F. App'x 91, 93 (9th Cir. 2009) (unpublished); *United States v. Varner*, 481 F.3d 569 (8th Cir. 2007); *United States v. Oaxaca*, 569 F.2d 518 (9th Cir. 1978).).

previously observed in plain view.  Of course, any prolonged intrusion must always be reasonable in duration and scope.[135]  But the cases cited by the United States suggest officers can reasonably remain or re-enter to seize plain view evidence.

At bottom, in the court's view, applying *Chimel* and *Gant* to the plain-view-seizure context in the way Yusuf proposes would constitute a significant expansion of these holdings and a significant limitation to the plain-view-seizure doctrine as set forth in *Horton*.[136]

For these reasons, the court declines to adopt Yusuf's interpretation of the plain view doctrine and instead applies it as set forth in *Horton*.

### 2.   Under the Plain View Seizure Doctrine, the Seizure of Yusuf's Items Was Reasonable

Under the first element of the plain view exception, the officer must be lawfully present in a place where the item can be seen in plain view.[137]  This means "the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed."[138]  Here, the evidence was in plain view from where the officers stood in the bedroom and in the kitchen.  The officers had arrived at the kitchen and the bedroom during the lawful execution of an arrest warrant.[139]  Thus, they were lawfully present where the items were in plain view.  Indeed, Yusuf conceded at oral argument that it was proper for officers executing an arrest warrant to enter the home after he failed to respond to their calls.  Even after officers arrested

---

[135] *See Brigham City*, 547 U.S. at 403.

[136] For example, as the court understands Yusuf's arguments, the agents who observed the laptop in plain view upon entering the kitchen would be lawfully present but not have lawful access to the evidence because it was not within Yusuf's reach at the time.  Only after arresting Yusuf, while escorting him through the kitchen, would they be lawfully present and have lawful access to seize the laptop.  This result is not consistent with current doctrine, as explained *infra*.

[137] *Horton*, 496 U.S. at 136–37.

[138] *Id.* at 136.

[139] *See Valdez v. McPheters*, 172 F.3d 1220, 1224–25 (10th Cir. 1999).

Yusuf, they were still lawfully present while escorting Yusuf out of the bedroom and through the kitchen, where they observed the laptop and document in plain view.  Thus, the first *Horton* element is satisfied.

Under the second *Horton* element, "the item must not only be in plain sight, but its incriminating character must also be immediately apparent."[140]  The incriminating nature of the evidence "must be immediately apparent to the seizing officer, and must rise to the level of probable cause."[141]  Still, even the "[s]eizure of everyday objects in plain view is justified where the officers have probable cause to believe that the objects contain or constitute evidence."[142]

Yusuf argues this element is not satisfied for three reasons: (1) "there was no indication that the devices observed in the defendant's residence had been used in the charged offense that occurred some two years earlier," (2) the information from Mathis about Yusuf's use of multiple cell phones and computers was four years old, and (3) "due to the prevalence of computers and cell phones in society today, the incriminating character of the items seized was not immediately apparent." [143]  The court disagrees.

*Horton* does not require, as Yusuf suggests, that the seizing officer have probable cause that the devices seized were the same devices used in the charged offense; only that the "incriminating character" of the devices is readily apparent.  Where, as here, the seizing officer testified that computers and cell phones were commonly used in the commission of the type of

---

[140] *United States v. Naugle*, 997 F.2d 819, 822 (10th Cir. 1993) (quoting *Horton*, 496 U.S. at 136).

[141] *Id.* at 823 (citing *Hicks*, 480 U.S. at 326).

[142] *United States v. Babilonia*, 854 F.3d 163, 180 (2d. Cir. 2017) (upholding warrantless seizure of cell phones and iPad because incriminating nature was immediately apparent to agent who knew the conspiracy involved use of cell phones).

[143] Dkt. 126 (Memo. Supp. First Mot.) at 12–13.

crime for which Yusuf had been indicted,[144] there is a "substantial probability" that the devices seized held evidence of a crime.[145]   Moreover, as the United States points out, "courts have routinely found agents had probable cause for the warrantless seizure of electronic devices where the seizing agents acted on information that electronic communications were somehow used in furtherance of the crime."[146]   Finally, the court agrees with the United States that given the ongoing nature of Yusuf's conduct, his continuing reliance on electronic communications and internet use, and the enduring nature of electronic storage, it is immaterial that evidence supporting the charged offense and officers' probable cause may have been up to four years old.[147]

Under the third *Horton* element, officers must have a lawful right of access to the item being seized.  This element is implicated "in situations such as when an officer on the street sees an [incriminating] object through the window of a house, or when officers make observations via aerial photography or long-range surveillance."[148]   Under those circumstances, "officers cannot use the plain view doctrine to justify a warrantless seizure, because to do so would require a warrantless entry upon private premises."[149]   But there is "no such problem" where "the [contraband was] in the [place] where the officer was permitted to be, and he did nothing more

---

[144] Dkt. 137 (Wright Testimony) at 16.

[145] *See Patel v. Hall*, 849 F.3d 970 (2017) ("[T]he relevant question [for probable cause] is whether there was a substantial probability—something more than a bare suspicion—that the person or property was involved in a crime.") (citation omitted).

[146] Dkt. 129 (Opp. First Mot.) at 9, 9 n.6 (collecting cases).

[147] Additionally, the United States points out that some incriminating electronic communications and conduct took place just months before the arrest.  *See* Dkt. 129 (Opp. First Mot.) at 17 n.13.

[148] *United States v. Benoit*, 713 F.3d 1, 11 (10th Cir. 2013).

[149] *Id.* at 11–12.

than to reach out" to seize it.[150]  Thus, the United States is correct in stating that "when agents are lawfully on private property, they have lawful access to those parts of the property where their presence is authorized."[151]  Here, the agents were permitted to be in the kitchen and bedroom both while executing the arrest warrant and while escorting Yusuf from the house. While there, they "did nothing more than to reach out" to seize the laptop, document, and cell phones[152] in plain view.[153]  Therefore, the third *Horton* element is satisfied.

Having found the *Horton* elements are satisfied, the court concludes the warrantless seizure of the laptop, document, and three cell phones from Yusuf's residence was lawful under the plain view exception to the warrant requirement.[154]

Accordingly, Yusuf's First Motion to Suppress is DENIED.

## II.      The Georgia Warrant is Sufficiently Particular

Yusuf's Second Motion challenges the particularity of the search warrant authorizing the search of his seized devices.  The United States argues the warrant includes sufficient limiting factors to be constitutionally narrow in scope.  The United States further argues that even if the

---

[150] *Naugle*, 997 F.2d at 823.

[151] Dkt. 129 (Opp. First Mot.) at 12.

[152] Even though the cell phones were uncovered during the execution of the arrest warrant, they could still be properly seized under the plain view exception because the agents had lawful access to look under the bedcovers where a person could be hiding.  *See Maryland v. Buie*, 494 U.S. 325, 332–33 (1990).

[153] *See Benoit*, 713 F.3d at 12 (finding the third *Horton* element was satisfied where the officer "was permitted to be in the office of [the] residence . . . . [and] 'did nothing more than reach out' seize the contraband.").

[154] The United States also argues under *Davis v. United States*, 564 U.S. 229, 236 (2011) that suppression should not be granted "where a search or seizure follows existing binding Circuit law," because in that circumstance the officers' conduct is not culpable and suppression fails to yield "appreciable deterrence."  Dkt. 129 (Opp. First Mot.) at 12.  The United States argues further that the arrest was carried out in the Eleventh Circuit, where binding case law at the time of the search authorized law enforcement to re-enter a premises to collect incriminating items observed in plain view during a lawful entry.  *Id.* (citing *Montanez v. Carvajal*, 889 F.3d 1202, 1212 (11th Cir. 2018) and *United States v. Jackson*, 618 F. App'x 472, 278 (11th Cir. 2015) (unpublished)).  The United States points to other courts that follow the same rule.  *Id.* at 10, 10 n.7 (citing *Harris v. Ford*, 369 F. App'x 881, 888 (10th Cir. 2010) (unpublished); *United States v. Oaxaca*, 569 F. 2d 518, 522 (9th Cir. 1978); *United States v. Varner*, 481F.3d 569, 573 (8th Cir. 2007)).

warrant is found to be invalid, the officers acted reasonably in good faith and suppression is not appropriate.

The court will first discuss the legal standard governing the warrant requirement. Next, the court will discuss the parties' arguments in light of that standard and the good faith exception.

*A.  Legal Standard*

The Fourth Amendment requires that search warrants be issued only "upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."[155]  The Supreme Court interprets this as a three-part requirement that a warrant: (1) be issued by a neutral and disinterested magistrate, (2) be supported by probable cause, and (3) describe with particularity the items to be seized and the places to be searched.[156]  Yusuf challenges the Georgia Warrant's particularity under the third element.

"The manifest purpose of the particularity requirement is to prevent general searches."[157]  This limitation ensures that "the search will be carefully tailored to its justification" and not become "the wide-ranging exploratory search the Framers intended to prohibit."[158]  "The test applied to the description of the items to be seized is a practical one."[159]  "A description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things

---

[155] U.S. Const. amend IV.

[156] *Dalia v. United States*, 441 U.S. 238, 255 (1979).

[157] *See Maryland v. Garrison*, 480 U.S. 79, 84 (1987).

[158] *Id.*

[159] *United States v Leary*, 846 F.2d 592, 600 (10th Cir. 1988).

authorized to be seized."[160]  While a warrant that describes the items to be seized "in broad or generic terms may be valid when the description is as specific as the circumstances and the nature of the activity under investigation permit," the government must "describe the items to be seized with as much specificity as the government's knowledge and circumstances allow[.]"[161] In other words, "whether a search warrant is sufficiently particular depends in part on the nature of the crimes being investigated."[162]  For example, "[t]he nature of [an] extended conspiracy" may be considered when assessing whether a warrant is sufficiently limited and specific.[163]  And "[w]arrants relating to more complex and far-reaching criminal schemes may be deemed legally sufficient even though they are less particular than warrants pertaining to more straightforward criminal matters."[164]

An affidavit is considered part of the warrant for purposes of the particularity requirement "only if the affidavit is both incorporated in and attached to the warrant."[165]

### B.  The Search Warrant Was Sufficiently Particular

Yusuf challenges the particularity of the warrant authorizing the search of Yusuf's devices on two grounds: (1) the search warrant was facially overbroad, and (2) the warrant failed to include particularized information available to the United States at the time the warrant was

---

[160] *Id.*

[161] *Id.*

[162] *United States v. Cooper*, 654 F.3d 1104, 1127 (10th Cir. 2011).

[163] *United States v. Hargus*, 128 F.3d 1258, 1362 (10th Cir. 1997).

[164] *Cooper*, 654 F.3d at 1127.

[165] *Id.* at 1126 n.11.

sought.[166]  Yusuf relies primarily on Tenth Circuit's decision in *United States v. Leary*,[167] which discusses ways in which a search warrant may fail to meet the particularity requirement.[168]  The court will address these in turn.

### 1.  The Warrant Was Not Facially Overbroad

Yusuf first argues the search warrant was facially overbroad because, like the warrant in *Leary*, the list of statutory references was too broad to limit the scope of the search,[169] thereby giving investigators "unfettered discretion in searching [Yusuf's] electronic devices[.]"[170]  It is true that "[a]n unadorned reference to a broad federal statute does not sufficiently limit the scope of a search warrant. . . . [a]bsent other limiting factors."[171]

The United States contends, however, that such limiting factors are present in the warrant at issue here.  Specifically, the United States argues the warrant includes at least three limiting features that, together with the list of statutory violations, render it sufficiently particular on its face: (1) the warrant adds a reference to a more particular statute,[172] (2) the warrant includes a

---

[166] Dkt. 116-1 (Memo. Supp. Second Mot.) at 4–11.  Yusuf also argues in conclusory fashion that "[i]t should be [] noted that in reviewing the information provided in the affidavit, it is clear that the scope of the search authorized by the warrant exceeded the probable cause described in the search warrant."  This appears to be directed at the third way the court in *United States v. Leary* determined a warrant may fail under the particularity requirement—that the scope of the warrant exceeded the probable cause in the supporting affidavit.  *See Leary*, 846 F.2d at 605.  Yusuf provides no argument or supporting facts specific to this conclusion, therefore the court will not address it.  Still, even if the scope of the warrant exceeded the probable cause in Hall's supporting affidavit, which the court doubts, the evidence seized would not be suppressed because the officers acted reasonably in good faith.  The court discusses this issue *infra*.

[167] 846 F.2d at 592.

[168] Dkt. 116-1 (Memo. Supp. Second Mot.) at 3–4.

[169] *Id.* at 8 (arguing the statutes referenced in the warrant, 18 U.S.C. §§ 1028A, 1343, 1349, and 1956(h), cover a broad range of actions that give investigators "unfettered discretion" to search Yusuf's electronic devices).

[170] *Id.*

[171] *Leary*, 846 F.3d at 602.

[172] Dkt. 123 (Opp. Second Mot.) at 16 (citing *United States v. Dockter*, 58 F.3d 1284, 1288 (8th Cir. 1995) (explaining that a warrant's reference to broad tax and conspiracy statutes did not invalidate the warrant where it also contained a reference to a firearm statute) and comparing it with *Rickert v. Sweeney*, 813 F.2d 907 (8th Cir.

reference to a particular date range for the violations of the statutes and requires that the violations involve particular persons,[173] and (3) the warrant included an exemplary list of the kinds of records that might provide evidence of the violations referenced.[174]

The court agrees with the United States. The Tenth Circuit emphasized in *Leary* "that it is not the mere reference to [a broad federal statute] that makes the [] warrant over broad, *it is the absence of any limiting features*."[175] The warrant at issue here includes sufficient limiting features, as demonstrated by the United States.

Yusuf further argues the Georgia Warrant is overbroad because it uses the word "including," followed by a list of materials to be seized, as a 'catch-all' phrase.[176] In *United States v. Otero*, the Tenth Circuit held that "warrants for computer searches must affirmatively limit the search to evidence of specific federal crimes or specific types of material."[177] The warrant in *Otero* impermissibly used the catch-all phrase "any and all information or data stored

---

1987) (explaining that references to tax and conspiracy statutes alone was insufficiently particular)); *Id.* at 17 (arguing the warrant included a reference to aggravated identity theft).

[173] *Id.* at 16 (citing *United States v. Lustyik*, No. 2:12-cr-645-TC, 2014 WL 1494019, *7–*8) (D. Utah Apr. 26, 2014) (unpublished) (finding that a warrant referencing many of the same statutes as here, namely 18 U.S.C. §§ 1341, 1343, 1346, was sufficiently particular because they also contained additional specifications, "such as the relevant time period and persons involved")); *Id.* at 17 (arguing the warrant includes a date range and is limited by reference to crimes involving Yusuf); *Id.* at 16.

[174] *Id.* at 16 (citing *United States v. Riley*, 906 F.2d 841, 844–45 (2d Cir. 1990) (description of seizable items is sufficiently particular if 'delineated in party by an illustrative list") and *United States v. Russo*, 483 F. Supp. 2d 301, 307–08 (S.D.N.Y. 2007) (warrant which identified large classes of materials, which were limited by reference to violations of 18 U.S.C. §§ 1343, 1349, 1956, 1957 is sufficiently particular)); *Id.* at 17 (arguing the warrant includes "an illustrative list of seizable records").

[175] *Leary*, 846 F.3d at 601 n.15.

[176] Dkt. 116-1 (Memo. Supp. Second Mot.) at 6–9; *see* Dkt. 129-12 (Search Warrant) at 28 (authorizing the search and seizure of "[a]ll records on each Device described in Attachment A that relate to violations of 18 U.S.C. §§ 1349, 1343, 1028A, and 1956(h) and involve SAHEED YUSUF since December 31, 2015, including," then listing five categories of records); *Id.* (authorizing the search and seizure of "[r]ecords evidencing the use of the internet to communicate with coconspirators, unknowing conspirators, or victims, including," then listing two categories of records).

[177] 563 F.3d 1127 (10th Cir. 2009) (citing *United States v. Riccardi*, 405 F.3d 852, 863 (10th Cir. 2005)).

on a computer."[178]  In a later unpublished opinion, the Tenth Circuit held that the phrase

"including, but not limited to," was also an impermissible catch-all phrase.[179]  Yusuf

acknowledges the Georgia Warrant does not use the phrase "including, but not limited to,"

however, he argues its use of the word "including" indicates the list that follows is a non-

exclusive list of materials.  Thus, according to Yusuf, it "involves the same lack of

particularization as was condemned [by the Tenth Circuit]."

       In response, the United States argues the use of certain phrases, such as "including" or

"including, but not limited to," can either expand or narrow the scope of a warrant depending on

whether it is placed before or after an illustrative list.  Specifically, the United States argues that

where the phrase is used before the scope of the warrant is defined, it serves to broaden the

scope, but where the phrase is used after the scope is already defined, it merely serves to

introduce an exemplary list, which further narrows the scope.[180]  The United States supports its

position by showing the cases cited by both parties are consistent with this distinction.[181]  As

applied in this case, the United States argues the Georgia Warrant imposes a general restriction

on seizable records by requiring they relate to violations of specific federal statutes with

additional limiting factors, then follows it with the word "including" to introduce an illustrative

list.[182]

---

[178] *Id.* at 1127.

[179] *United States v. Dunn*, 719 F. App'x 746 (10th Cir. 2017) (unpublished) (following *United States v. Bridges*, 344 F.3d 1010, 1017–18 (9th Cir. 2003)).

[180] Dkt. 123 (Opp. Second Mot.) at 18, 20.

[181] *Id.* at 18–20 (comparing cases that place the phrase "including, but not limited to" before a defined scope with cases placing the phrase after to show the latter group of cases found the warrants sufficiently particular).

[182] *Id.* at 20 ("[A]s courts have observed, when an illustrative list follows a general restriction on the scope of records to be seized, the illustrative list helps to guide the agent's discretion and narrow the scope rather than expand it.").

While the court finds the United States' arguments persuasive, it declines to adopt this reasoning wholesale absent more direct guidance from binding authority.  Moreover, the Georgia Warrant uses the word "including," whereas the cases cited by the United States use the phrase "including, but not limited to."  Both parties appear to agree these phrases are interchangeable, but the court is not prepared to make that determination.[183]  In the court's view, "including" is more narrow than "including, but not limited to" because it simply identifies items in a list as exemplars.  But "including, but not limited to" explicitly broadens the scope to include items beyond those listed.  Nevertheless, with the addition of the limiting features described above, the court is satisfied the language of the Georgia Warrant, as written, is not unconstitutionally overbroad on its face.[184]

### 2.   The Warrant Did Not Fail to Include Particularized Information Available to the United States

Yusuf next argues the United States failed to include information from the supporting affidavit that would have narrowed the scope of the Georgia Warrant to specific transactions, entities, or individuals already known to agents.[185]  Specifically, Yusuf points to the names of Vanisha Mathis, a known co-conspirator, Ashley Smith, Allied Logistics Group, Johnson Applegate, and Vintage Equipment Services.[186]  Yusuf also points to several specific transactions identified from Mathis' interview.[187]

---

[183] *See id.* at 18–20; Dkt. 116-1 (Memo. Supp. Second Mot.) at 8–9.

[184] Yusuf makes a third argument that because "the affidavit is not referenced with respect to the part of the warrant describing the devices to be searched," the particularity of the affidavit cannot cure the overbreadth of the warrant, as permitted by *Leary*.  Dkt. 116-1 (Memo. Supp. Second Mot.) at 9–10.  The court need not reach this argument because it finds the warrant is not overbroad on its face.

[185] Dkt. 116-1 (Memo. Supp. Second Mot.) at 10–11.

[186] *Id.*

[187] *Id.*

Given the nature of Yusuf's alleged scheme, the court disagrees that the United States was required to limit the scope of the Georgia Warrant to these known names and transactions. The description of items to be searched and seized need only be "as specific as the circumstances and the nature of the activity under investigation permit."[188]  And "the complexity of an illegal scheme [may not be used] as a shield to avoid detection."[189]  Here, the affidavit presented probable cause to believe Yusuf was working internationally with multiple co-conspirators and using multiple entities to defraud a variety of businesses over a period of years.[190]  Thus, the court agrees with the United States that "where there is reason to believe the known transactions were merely part of ongoing activity, the details of which were not entirely known, the warrant need not be limited to the particulars of the known transactions."[191]  Accordingly, the court finds the Georgia Warrant is not deficient by failing to include particularized information available to the United States.

### C.  *The Good Faith Exception Prevents Suppression Even If the Warrant Lacks Particularity*

The purpose of the exclusionary rule is to deter unlawful police conduct.[192]  For this reason, the court need not "suppress the fruits of a search so long as the executing officer ha[d] a good-faith belief that the warrant authorizing the search was valid."[193]  "Suppression of evidence obtained pursuant to a warrant should be ordered only in the unusual case in which exclusion

---

[188] *Leary*, 846 F.2d at 600 (internal citations omitted).

[189] *Andresen v. Maryland*, 427 U.S. 463, 480 n.10 (1977).

[190] Dkt. 129-12 (Hall Affidavit) at ¶¶ 13, 18–21, 26–27, 42–43.

[191] Dkt. 123 (Opp. Second Mot.) at 20.

[192] *Herring v. United States*, 555 U.S. 135, 139–40 (2009).

[193] *United States v. Pacheco*, 884 F.3d 1031, 1042 (10th Cir. 2018) (citing *United States v. Leon*, 468 U.S. 897 (1984).

will further the purposes of the exclusionary rule."[194]  When an officer relies in "objective good faith" on a warrant, even if it is later invalidated, "there is no police illegality and thus nothing to deter."[195]

Courts presume that "when an officer relies upon a warrant, the officer is acting in good faith."[196]  Indeed, "[t]he fact that a magistrate has issued a warrant is the clearest indication of the officer's objective good faith."[197]  "This presumption, though not absolute, 'must carry some weight.'"[198]  "It is only when an executing officer's reliance was *wholly unwarranted* that good faith is absent."[199]  For this reason, the validity of a search pursuant to an insufficiently particularized warrant turns on the objective reasonableness of the officer's failure to realize the overbreadth of the warrant.[200]  The question is "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization."[201]

In determining whether an officer acted in good faith, the court must look to "all the circumstances."[202]  Relevant circumstances may include the executing officer's familiarity with the investigation, the executing officer's involvement in the preparation of the search warrant application, the stage of the investigation (i.e., is the criminal conduct sufficiently understood to

---

[194] *Riccardi*, 405 F.3d at 863.

[195] *United States v. Wagner*, 951 F.3d 1232, 1243 (10th Cir. 2020) (quoting *Leon*, 468 U.S. at 920–21).

[196] *United States v. Harrison*, 566 F.3d 1254, 1256 (10th Cir. 2009).

[197] *Leon*, 468 U.S. at 922–23.

[198] *Harrison*, 566 F.3d at 1256 (citing *United States v. Cardall*, 773 F.2d 1128, 1133 (10th Cir. 1985)).

[199] *Id.* (emphasis in original).

[200] *Garrison*, 480 U.S. at 88 ("[T]he validity of the search of respondent's apartment pursuant to a warrant authorizing the search of the entire third floor depends on whether the officers' failure to realize the overbreadth of the warrant was objectively understandable and reasonable.").

[201] *Riccardi*, 405 F.3d at 863 (quoting *Leon*, 468 U.S. at 922 n.23).

[202] *Leon*, 468 U.S. at 922 n.23.

33

support an indictment), and the scope of the materials actually seized during the investigation.[203]
If the court determines an officer acted in good faith, it need not resolve the remaining
contentions in a suppression motion, but it may still choose to do so.[204]

Yusuf argues the court should look to the five factors the Tenth Circuit addressed in
*United States v. Riccardi* to determine whether the good faith exception applies here.[205] Based
on those five factors, Yusuf argues the good faith exception does not apply because (1) the
affidavit describes allegations relating to a specific co-conspirator and a transaction relating to a
specific bank account, but the attachment to the Georgia Warrant uses a catch-all phrase to
expand the scope of the warrant, (2) the investigators who executed the Georgia Warrant had not
been involved in the initial investigation, (3) there is no indication that the officers sought or
obtained assurance from prosecutors that there were no problems with the sufficiency or scope of
the Georgia Warrant, (4) the Georgia Warrant does not describe the methodology or manner in
which it was to be executed or how the search of computer databases would be appropriately
limited to evidence of the transactions, communications, or individuals described in the affidavit,
and (5) there is no indication the materials seized from the computer and cell phones were

---

[203] *See, e.g.*, *United States v. Guidry*, 199 F.3d 1150, 1155 (10th Cir. 1999).

[204] *See Harrison*, 566 F.3d at 1256 ("We need not address Mr. Harrison's probable cause arguments because, as the Supreme Court held in *Leon*, reviewing courts may reject suppression motions posing no important Fourth Amendment questions by turning immediately to a consideration of the officers' good faith.").

[205] *See Riccardi*, 405 F.3d at 864. The five factors used in support of applying the good faith exception in *Riccardi* were: (1) the affidavit limited the search to child pornography, (2) the officers executing the warrant were involved in the investigation throughout, and one of the executing officers actually wrote the affidavit to support the application, (3) an agent stopped to ask if the warrant was sufficient and received assurances from a detective, (4) the search methodology was limited to finding child pornography, and (5) the investigators seized only evidence relevant to the crimes identified in the affidavit. *Id.*

limited to evidence of the transactions, communications, or individuals described in the affidavit.[206]

The United States argues *Riccardi* is instructive, but not determinative, because the court is required to consider "all the circumstances" in analyzing an officer's good faith.[207]  The United States further argues it is improper to narrow the court's focus to whether the same circumstances are present as were present in *Riccardi*.[208]  Still, the United States argues each of the *Riccardi* factors weighs in favor of applying the good faith exception, and that Yusuf "relies on an errant recitation of the facts" to reach the opposite conclusion.[209]  The court agrees with the United States.

First, the Georgia affidavit at issue here was not limited to describing "a specific co-conspirator and a transaction relating to a specific bank account," but instead described multiple co-conspirators, known and unknown, participating in a conspiracy to defraud a variety of businesses, and employing multiple accounts to do so.[210]  The scope of the conspiracy under investigation was not limited to a single co-conspirator, transaction, or account.

Second, it is true the analysts performing the actual search of the devices were likely not involved in the investigation, but Special Agent Hall, who prepared the Georgia Warrant application and executed it, was the same agent helping investigate the case from the beginning and was aware of the nature of the criminal investigation.[211]

---

[206] Dkt. 116-1 (Memo. Supp. Second Mot.) at 13.

[207] Dkt. 123 (Opp. Second Mot.) at 21.

[208] *Id.*

[209] *Id.*

[210] Dkt. 123-3 (Olsen Affidavit) ¶¶ 12–13, 19–21, 27, 42–43.

[211] Dkt. 123-4 (Pugmire Decl.) ¶¶ 2, 9.

Third, contrary to Yusuf's argument, agents involved prosecutors in the preparation of the Georgia Warrant application. Special Agent Hall prepared the application based largely on information provided by the federal prosecutor.[212] When information obtained during a second interview with Mathis varied in part from her first interview, which initially supported the Georgia Warrant, agents paused the search and sought a new warrant based on the varied information.[213] Thus, agents did seek reassurances concerning the validity of the Georgia Warrant when they learned of a potential inaccuracy.

Fourth, it is true that the Georgia Warrant did not describe how the search methodology would be limited. But the search warrant in *Riccardi* was issued before the Tenth Circuit, in *United States v. Brooks*, clarified that it "has never required warrants to contain particularized computer search strategy."[214] Warrants for computer searches must, however, "affirmatively limit the search to evidence of specific federal crimes or specific types of material."[215] But "it is folly for a search warrant to attempt to structure the mechanics of a search" where "imposing such limits would unduly restrict legitimate search objectives."[216]

Fifth, as the United States points out, it has produced in evidence the files seized from Yusuf's devices which agents believed were relevant to a conspiracy to impersonate others and launder the proceeds of the fraud.[217] Yusuf has failed to identify any items that do not fall within the scope of the crimes described in the affidavit.

---

[212] *Id.* ¶ 9.

[213] Dkt. 123-3 (Olsen Affidavit) ¶¶ 38–44.

[214] 427 F.3d 1246, 1251–52 (10th Cir. 2005).

[215] 576 F.3d 1078, 1091 (10th Cir. 2009).

[216] *Id* at 1094.

[217] Dkt. 123-4 (Pugmire Decl.) ¶ 17.

In addition to the *Riccardi* factors, other facts suggest the agents executing the Georgia Warrant understood its scope and purpose and acted in good faith.  First, the Georgia Warrant was executed post-indictment, and the Tenth Circuit has found this to be a significant fact related to the agents' understanding of the scope of a warrant.  Second, the agents who executed the Warrant were both involved in the investigation, as in *Riccardi*, and supplied many of the facts provided to the magistrate judge in the Georgia Warrant's application.[218]

Considering these circumstances, the court concludes the officers acted reasonably and in good faith by relying on the Georgia Warrant.[219]

Having concluded the officers acted in good faith reliance, suppression would not be proper regardless of whether the Georgia Warrant lacked sufficient particularity.  Therefore, Yusuf's Second Motion to Suppress is DENIED.

## CONCLUSION

For the reasons stated, Yusuf's Motions to Suppress[220] are DENIED.  The seizure of Yusuf's items was reasonable under the plain view doctrine, and the subsequent search of the devices was reasonable because officers acted pursuant to a search warrant that was not constitutionally deficient.  Had the Georgia Warrant lacked sufficient particularity, suppression would still be improper because the officers acted in good faith.

---

[218] *See Guidry*, 199 F.3d at 1155.

[219] *See Harrison*, 566 F.3d at 1256 ("The first notion to be remember in considering the good faith principles is the presumption created in *Leon* that when an officer relies upon a warrant, the officer is acting in good faith.  This presumption, though not absolute, must carry some weight.").

[220] Dkt. 97 (First Motion); Dkt. 116 (Second Motion).

SO ORDERED this 18th day of October 2021.

BY THE COURT:

ROBERT J. SHELBY
Chief United States District Judge